# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mark David Brown, | No.  CV 21-00050-TUC-DCB |
| Plaintiff, | |
| v. | **ORDER** |
| Peter Basznianyn, et al., | |
| Defendants. | |

Pro se Plaintiff Mark David Brown, who is not in custody, brought this civil rights action pursuant to 42 U.S.C. § 1983, alleging unreasonable seizure and excessive use of force by Pima County Sheriff's Department (PCSD) employees at the Pima County Adult Detention Center (PCADC). (Complaint (Doc. 1)). Defendants PCSD Sergeant Peter Basznianyn and Corrections Officers (COs) Scott Graves, Kevin Holguin, Jonathan Palmer, Victor Vidaurri, and Oscar Leon filed a Motion for Summary Judgment or in the Alternative Partial Summary Adjudication (Doc. 29) of the claims brought against the individually named Defendants. Plaintiff was informed of his rights and obligations to respond pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc) (Doc. 31), and he opposes the Motion.  (Doc. 34.)  Defendants filed a Reply.  (Doc. 44.)

The Court grants summary judgment for Defendants, individually and in their official capacities because Defendants are entitled to qualified immunity from suit.

/////

/////

## I.  Legal Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything.  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial.  *Anderson*, 477 U.S. at 249.  In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor.  *Id.* at 255.  The court need consider only the cited materials, but it may consider any other materials in the record.  Fed. R. Civ. P. 56(c)(3).

/////

/////

/////

## II. Facts

### A. Background

Plaintiff is a member of a group, who consider themselves first amendment auditors and frequently come to City Court and other locations to film police officers while they perform their duties. On the morning of February 6, 2019, Tucson Police (TPD) officers arrived at Tucson City Court to perform a stop and arrest based on a warrant issued against Plaintiff for previous disorderly conduct and contributing to the delinquency of a minor. After placing Plaintiff under arrest, TPD officers were walking Plaintiff through the courthouse hallways on the way to be transported to PCADC, when he fell. He does not sue TPD officers in this action. *See* (*Brown v. Guinne*, CV 19-415 TUC DCB). It is not relevant to the claims in this case, whether he tripped, the TPD officer tripped him, or he intentionally threw himself to the floor. *See* (Dragon body-camera recording, Ex. 2 (Doc. 41) at 3:14 minutes into the recording.)[1]

What is relevant, is that he hit his head. This is undisputed. Plaintiff lay, immobile, as if unconscious, prone upon the ground. TPD officers called paramedics and the fire department, who arrived shortly. Paramedics were able to sit him up, but Plaintiff remained as if unconscious, completely nonresponsive to the Emergency Medical Technicians (EMTs), who asked him his name and other questions and to open his eyes. In the course of their assessment and to rouse him, EMTs administered a sternum rub. Plaintiff was quite responsive to this procedure, screaming, flailing, and kicking. *Id.* at 12:09 to 15:26.[2]

---

[1] In their Reply, Defendants argue that Plaintiff has identified the videos as coming from Tucson Police Department Officers Williams and Dragon, but Plaintiff "has no evidence from either witness laying the foundation that this video is a true and accurate copy from their body camera. In fact, there is no evidence from anyone at TPD authenticating the video." (Doc. 44 at 8.) Defendants also contend the videos "contain other violations of the Federal Rules of Evidence, such as hearsay," and there has been "no authentication of the identity of the voices on the video." (*Id.*) Defendants assert "there is a high probability that inadmissible evidence exists on the video. (*Id.*) First, Defendants produced the videos to Plaintiff. It defies belief that Defendants would produce video whose origin they did not know and could not verify. Moreover, "[t]o survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial." *Block v. City of Los Angeles*, 253 F.3d 410, 418–19 (9th Cir. 2001); *see Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003).

[2] Citation is to the number of minutes into the recording.

Again, Plaintiff fell into an unconscious-like posture, and after administering a second sternum rub, the EMT noted he was plenty conscious when mad and able to open his eyes. The EMT reported that Plaintiff had a bump on his head, his vitals were good, and TPD officers recommended transporting him to PCADC. *Id.* at 17:19.

From this time forward for the remainder of the relevant time, the Plaintiff appears to be in an unconscious stupor requiring officers to physically lift him into their police car. He rarely responds to inquiries from TPD or Defendants, and only responds that his head hurts, he cannot (it hurts) stand or sit up, and he wants to be taken to the Veterans Administration Hospital. He refuses to sit up or stand of his own volition, and when sat up by others he remains sitting for short periods of time before returning to a prone position. In short, his legs appear to be paralyzed. He does scream in response to alleged pain when physically lifted and moved from place to place or positioned sitting up. *Id.* at 18:15 to 27:43; (Williams body-camera recording, Ex. 1 (Doc. 41)).

### B. Defendants' Facts

On February 6, 2019, Defendant Kevin Holguin was on duty at the PCADC. (Decl. of Kevin Holguin ¶ 4 (Doc. 30-1) at 27.) Medical staff notified Defendant Holguin that he needed to evaluate a new arrestee (Plaintiff). (*Id.*) Defendant Holguin escorted medical staff to the secure parking lot to evaluate Plaintiff. (*Id.*) Medical staff determined that Plaintiff "was able to be detained at the facility and did not have to go to the hospital." (*Id.*) Nurse Song entered a general note in Plaintiff's medical file stating, "Pt arrived in TPD police vehicle. TPD officer asked EMT screener to check on the patient in the car, because he was walking, threw himself on the ground (purposefully) and hit his head, but he was cleared by TFD at scene. Now he says his head hurts." (Doc. 30-1 at 47.) Nurse Song wrote that Plaintiff was seated in the backseat of the police vehicle, handcuffed behind his back, and stated that he needed to go the hospital. (*Id.*) Nurse Song wrote that Plaintiff "refused to turn around toward [Song] for assessment" and that Plaintiff did not "get out of the police vehicle when asked by the officers." (*Id.* at 48.) Nurse Song wrote that Plaintiff "was taken out of the vehicle" and sat on the ground. (*Id.*)

Defendant Holguin assisted Plaintiff in moving his legs so that he could exit the TPD vehicle. (Holguin Decl. ¶ 5.) Defendant Holguin asked Plaintiff if he was going to walk into the facility, and Plaintiff "agreed to do so." (*Id.*) With Defendant Holguin holding Plaintiff's arm and supporting some of Plaintiff's weight, Plaintiff began exiting the vehicle but then "dropped suddenly and heavily to the ground." (*Id.*) Defendant Holguin and TPD officers tried to help Plaintiff to his feet "on multiple occasions," but Plaintiff "continued to drop to the ground and refused to walk." (*Id.*) Defendant Holguin instructed Plaintiff to get up and walk, but Plaintiff refused.[3] (*Id.*) Because Plaintiff refused to obey verbal orders, Defendant Holguin called for additional officers via the radio. (*Id.* ¶ 6.) Defendants Basznianyn, Graves, Palmer, and Vidauurri responded.

Corrections Officers are required to search any detainee prior to allowing him into PCADC to ensure the detainee does not have any weapons or other contraband. (*Id.* ¶ 6.) Because Plaintiff refused to stand up, the required pat search could not be conducted. (*Id.*; Vidaurri Decl. ¶ 5.)

Defendant Vidaurri informed Plaintiff that if he did not comply, he would be placed into a restraint chair for at least two hours. (Vidaurri Decl. ¶ 5.) Due to Plaintiff's behavior, a restraint chair was brought to the parking lot, and Plaintiff was told that if he did not cooperate and walk into the facility, then he would be placed in the restraint chair. (Graves Decl. ¶ 5.) Plaintiff still refused to comply. (Basznianyn Decl. ¶ 7; Graves Decl. ¶ 5; Vidaurri Decl. ¶ 5.)

Plaintiff was lifted off the ground and seated in the restraint chair. (Basznianyn Decl. ¶ 8.) Defendant Palmer "helped by securing Plaintiff['s] head to prevent him from biting or head-butting staff" by placing his hands on the side of Plaintiff's face. (Palmer Decl. ¶ 5.) Defendant Palmer did not "use the hypoglossal pressure point" and "did not have to keep [Plaintiff] from struggling against it." (*Id.*)

---

[3] Defendants also submit a Declaration of Sergeant Williams, which was filed in CV 19-00415-TUC-DCB. In the Declaration, Sergeant Williams declared that once Plaintiff was at the PCADC, Plaintiff "refused to walk on his own, claiming he was unable, and jail staff were forced to carry [him]." (Williams Decl., Doc. 30-1 at 96 ¶ 25.)

Once Plaintiff was seated in the restraint chair, he "pushed his legs out and attempted to push his waist up." (Basznianyn Decl. ¶ 8.)  Plaintiff continued to refuse to comply with officers' directives to sit in the chair, despite being handcuffed.  (*Id.*)  After Plaintiff was placed in the restraint chair, he "immediately began to stand up" and "continued to kick and tense his body."  (Vidaurri Decl. ¶ 6.)

Officers were able to secure the waist restraint, and Plaintiff "began to calm down." (Basznianyn Decl. ¶ 9.)  The officers leaned Plaintiff forward to take the handcuffs off, but Plaintiff "pushed back," which prevented staff from removing the handcuffs.  (*Id.*)  Staff were able to "bend Plaintiff [] forward and remove the handcuffs, complete the restraint, and take Plaintiff into the PCADC.  (*Id.*)

After Plaintiff was wheeled inside, he saw Nurse Song.  Nurse Song evaluated Plaintiff and "cleared" him to remain in the chair.  (Graves Decl. ¶ 7; (Palmer Decl. ¶ 6.) Defendant Palmer then escorted Plaintiff to the holding cell.  (*Id.*)

After an hour, Defendant Palmer saw the nurse and sergeant reevaluate Plaintiff. (*Id.* ¶ 7.)  Defendant Palmer assisted with removing Plaintiff from the restraint chair and a pat search.  (*Id.* ¶ 8.)  After he was removed from the restraint chair, Plaintiff "did not voice any complaints of pain, injury, or other problems."  (*Id.*)

### C.    Plaintiff's Facts

Defendants Graves and Holguin were present when Plaintiff arrived at the PCADC at approximately 9:43 a.m.  (Pl.'s Controverting Statement of Facts, Doc. 45 at 10 ¶ 16, 19 ¶ 52.)  Plaintiff did not refuse to get out of the patrol car.  (*Id.* ¶ 2.)  Plaintiff was injured, handcuffed, and "crammed in the backseat with his feet touching one side back against the passenger side."  (*Id.*)  Plaintiff told Defendant Graves that he could not move.  (*Id.*) Defendant Graves "yanked [Plaintiff] out of the car by the hand[]cuffs."  (*Id.*)  Plaintiff said, "that hurts," and Defendant Graves responded, "it's going to hurt."  (*Id.*)  Plaintiff exclaimed, "oh my arms" and "ouch my arms I can't."  (*Id.* ¶ 3.)

Plaintiff told Defendant Graves that his head hurt, and he needed to go to the hospital.  (*Id.* ¶ 2.)  Defendant Graves responded that Plaintiff had already seen the nurse

and that if Plaintiff did not listen to him, he would "strap [Plaintiff] down to a restraint chair for 2 hours." (*Id.*) Plaintiff again asked to go the hospital, and Defendant Graves responded, "you're not going to get anything from us." (*Id.*) Defendant Graves then said, "the chair it is." (*Id.*) Plaintiff never refused to stand up or walk into the PCADC, and he did not kick or tense his body to avoid being restrained. (*Id.* ¶¶ 3-4.)

A restraint chair was brought to the parking lot. (*Id.* ¶ 7.) The officers picked up Plaintiff and "violently" "thr[ew] him in[to] the restraint chair" with his hands still cuffed behind his back. (*Id.*) Plainitiff yelled in pain as the officers strapped him into the restraint chair. (*Id.* ¶ 8.) Once Plaintiff was in the restraint chair, Sergeant Williams explained Plaintiff's charges. (*Id.* ¶ 7.)

Plaintiff was calm and sitting on his hands in the restraint chair when Defendants Basznianyn, Palmer, and Holguin bent Plaintiff forward "and started violently attacking him." (*Id.*) Defendant Palmer put his hands on either side of Plaintiff's face and "squeez[ed]" his head. (*Id.* ¶ 11.) Plaintiff gagged, choked, and repeatedly stated that he could not breathe and asked for help and for the officers to "stop." (*Id.* ¶ 8.) Defendant Palmer struggled with Plaintiff and pushed Plaintiff's head down between his knees. (*Id.* ¶ 26.) Plaintiff again gagged and said he could not breathe. (*Id.* ¶ 8.)

Officers "pretend[ed] to struggle with" Plaintiff. (*Id.* ¶ 79.) An officer told Plaintiff to "stop pulling." (*Id.*) Defendant Palmer bent Plaintiff's left arm up and squeezed both sides of Plaintiff's head, while Defendant Basznianyn placed a spit mask on Plaintiff. (*Id.* ¶¶ 3, 79.) Plaintiff eventually lost consciousness. (*Id.* ¶ 3.) At approximately 9:54 a.m., Defendant Basznianyn wheeled Plaintiff, "unconscious" and "motionless," into the PCADC. (*Id.* ¶¶ 3, 7, 8, 27.) Plaintiff was still strapped in the restraint chair wearing the spit mask. Plaintiff never refused to comply with officers' directives. (*Id.* ¶ 7.)

Inside the facility, Plaintiff remained in the restraint chair for two hours. (*Id.* ¶ 54.) During that time, nurses checked Plaintiff's vital signs. (*Id.* ¶ 14.) At 10:00 a.m., when Plaintiff was "passed out with a spit mask on," his blood pressure was 181/104. (*Id.* ¶ 14.)

At 11:00 a.m., his blood pressure was 153/95, and at 12:00 p.m., it was 167/96….MKJ (*Id.*)

### D. The Video Evidence

The Court has reviewed two body camera recordings from TPD officers and three PCADC security camera video recordings from the parking lot and the holding cell. The security camera videos do not have audio. The body camera recordings do have audio, which is periodically turned off by the operating officer. By viewing both sources, the Court was able to obtain a comprehensive picture of the events that transpired on February 6, 2019. One body camera recording reflects both what transpired at City Court when Plaintiff was arrested and during his transport to PCADC. The other body camera recording reflects what transpired in the PCADC secured parking lot (sally port). There are three security camera recordings, which cover the parking lot, the holding cell, and the nurses' station.

The video recordings, generally, comport with Defendants' representations. *See* (Williams body-camera recording, Ex. 1 (Doc. 41); P Ex. 11 Brown_Secured Lot.) TPD arrived at PCADC around 9:40 A.M. (P Ex. 11 Brown_Secured Lot at 9:35:20.) TPD remains on the scene for the duration of the transfer, but Defendants take responsibility for removing Plaintiff from the police car, conveying him from the PCADC sally port into the detention facility, placing him in the holding cell, monitoring him in the holding cell, and booking him into the detention facility.

As reflected in Nurse Song's notes, Defendants were informed by the arresting officers that Plaintiff fell during the arrest, had a bump on his head, was checked out and found to be ok by EMTs, and had been asking to go to a hospital. After arriving in the PCADC parking lot, nothing happens for approximately 6 minutes. Then a PCADC officer opens the patrol car door and asks Plaintiff to look towards the nurse, who asks him to look at her- subsequently, she appears to clear him with a thumbs up. (Williams body-camera recording, Ex. 1 (Doc. 41) at 43:15 to 43:50.)

When Defendants begin to remove Plaintiff from the police vehicle, one of the TPD officers informs them: "we had to pull his ass in and pull his ass out." (Williams body-camera recording, Ex. 1 (Doc. 41) at 44:05).

Defendant Holguin asks the Plaintiff to please get out of the police car because it will be so much easier than if they must lift him out. Plaintiff has his legs extended across the back seat of the car, with his back leaning on the car door. His hands are cuffed behind his back. Defendant Holguin moves Plaintiff's legs and supports Plaintiff's weight by holding his upper arm. Contrary to Plaintiff's assertion, the body camera recording reflects there was no pulling or yanking. As Plaintiff's body comes out of the vehicle and Defendant Holguin and a TPD officer try to help him stand, the Plaintiff protests that he cannot stand and sinks to the ground. Defendants try to keep him upright and tell him to put his feet down and stand so he can walk into PCADC. Plaintiff, however, sinks to the ground. Defendants place their legs behind his back to keep him in a sitting position. They urge him to standup and walk. Instead, Plaintiff insists he is incapable of walking into the detention facility of his own volition, he claims his head hurts and asks repeatedly to go to a hospital. He continues in his protestations even after Defendants inform him that he will be placed in a restraint chair for not cooperating. The restraint chair is brought out. Defendants lift Plaintiff off the ground into the restraint chair. While Plaintiff continues to complain that "it hurts," the body camera recording clearly contradicts the Plaintiff's assertion that Defendants violently threw him into the restraint chair. (Williams body-camera recording, Ex. 1 (Doc. 41) at 43:58 to 46:16.)

To be properly secured in the restraint chair, Plaintiff's hand cuffs had to be removed so that his torso, legs, arms, wrists, and head could be secured in the chair. The video clearly reflects that initially, as described by Plaintiff, he was calm and sitting on his hands in the chair. The body camera video does not, however, support his assertion that then the Defendants violently attacked him and bent his body forward shoving his head to his knees choking him into unconsciousness. The video shows that as Defendants begin to position Plaintiff in the chair, the Plaintiff arches and tenses his back, and wriggles so that

he slips down in the chair moving towards the ground. It took four officers to physically get control of the Plaintiff, including bending him forward while trying to secure him in the chair. Plaintiff protested that he was unable to bend forward and could not breath. He choked and gasped, and moaned and groaned. To remove the hand cuffs, Plaintiff needed to bend forward to make his hands and the cuffs accessible to the detention officer trying to unlock them. Finally, Defendants were able to remove the handcuffs, position him in the chair and secure him there. While it does not appear to have been a pleasant experience, the videos reflect a degree of force was needed to secure the Plaintiff in the restraint chair because the Plaintiff would not on his own volition let them secure his legs and belly restraint, he would not bend forward or allow his handcuffs to be removed, and he did not passively allow his arms and wrists to be repositioned forward and secured to the arms of the chair. (Williams body-camera recording, Ex. 1 (Doc. 41) at 43:58 to 46:16.)

During the time he was bent over in the restraint chair, Plaintiff alleges he was suffocated to the point of becoming unconscious, and he woke up in the holding cell. The video reflects that securing Plaintiff in the restraint chair lasted approximately 5 minutes. The audio reflects the Defendants used physical force to hold Plaintiff to keep him from getting out of the restraint chair, including bending him forward while they try to secure his legs and remove his handcuffs. *Id.* at 47: 25. Plaintiff groans at 50:32, the cuffs were removed at 51:00, and an officer asks him to stop pulling at 51:17, when Defendants are trying to position Plaintiff's arms and hands forward and secure his arms and wrists to the chair. The video recording reflects that the Plaintiff was not unconscious after being bent forward and after the hand cuffs were removed because he continued to struggle with the detention officers as they tried to position his uncuffed arms and wrists in the restraint chair. Plaintiff's only contradiction to this video evidence is his conclusory assertion that Defendants pretend to struggle with him.

Plaintiff complains that Defendant Palmer put his hands on either side of Plaintiff's face and "squeez[ed]" his head. This does not dispute Defendant Palmer's assertion that he "helped by securing Plaintiff['s] head to prevent him from biting or head-butting staff"

by placing his hands on the side of Plaintiff's face. Defendant Palmer attests that he did not "use the hypoglossal pressure point" and "did not have to keep [Plaintiff] from struggling against it." The video reflects that the Defendant Palmer placed his hands one on each side of Plaintiff's face around the cheek and jaw area. He used some force to move the Plaintiff's head back and into place on the chair and held it there while shoulder straps were secured to keep Plaintiff sitting upright in the chair. The Court accepts the Plaintiff's assertion that his head was squeezed. The time this occurred was approximately 30 seconds. After that, it is clear on the video that Defendant Palmer's hands are relaxed even though they remain in place. *Supra.* at 5, 7; *see also,* (Williams body-camera recording, Ex. 1 (Doc. 41) at 52:22 to 52:52, and to 53:10).

At 9:55 am, the Plaintiff, secured in the restraint chair, was wheeled inside. Once fully restrained in the chair, Plaintiff appears immobile but there is no evidence that he was unconscious.

To support his allegations of injury, the Plaintiff submits his blood pressure readings from the Inmate Restraint form, which were taken when he was placed in the holding cell at 1000 (10:00 am) as 181/95, at 1100 (11:00 am) as 153/95, and when he was released from the holding cell at 1200 (12:00 pm) as 167/96. (P SOF, Ex. 6: Inmate Restraint Form (Doc. 35-2) at 21.) According to the American Heart Association, a hypertensive crisis occurs when a person's blood pressure rises quickly and severely, with readings of 180/120 or greater. The consequences of a hypertensive crisis can be severe and include stroke, loss of consciousness, memory loss, heart attack, damages to the eyes and kidneys, loss of kidney function, aortic dissection, angina, and pulmonary edema. Hypertension stage 2 is when a blood pressure reading is 140/90 or higher. (P SOF ¶14 (citing https://www.heart.org/en/health-topics/high-blood-pressure/understanding-blood-pressure-readings/hypertensive-crisis-when-you-should-call-911-for-high-blood-pressure (last visited Mar. 20, 2023).

Plaintiff ignores the SPO2 reading of 98% at 1000, which reflects almost 100% oxygen saturation, a fact cutting against his assertion that he was unconscious due to lack

of oxygen because Defendants choked him. His pulse is high at 95, 106 and 108, but there is no assertion of injury related to these readings. Nurse Song recorded on the Inmate Restraint form that Plaintiff was sitting, there is no edema, and no injuries. Her notes do not reflect he was unconscious at any point, and she conducts routine checks at every hour, including when he is removed from the holding cell. She reports that he reports no injuries, but more importantly the blood pressure readings which are all below 180/120 do not support Plaintiff's assertion that he experienced a hypertensive crisis. There is no evidence that he suffered a stroke, memory loss, heart attack, damages to his eyes and kidneys, etc. The only evidence presented by Plaintiff is his self-serving statement that he experienced a loss of consciousness. The Court accepts this as true for purposes of granting summary judgment.

**III. Discussion**

Defendants advance four arguments in support of their Motion: Defendants did not violate Plaintiff's constitutional rights or use excessive force against Plaintiff; Defendants are entitled to qualified immunity; Defendants did not seize Plaintiff, and his Fourth Amendment claim is without merit; and there is no evidence to support a claim for punitive damages. (Motion (Doc. 29) at 2.)

**A.     Fourth Amendment vs. Fourteenth Amendment**

The Defendants correctly assert that they did not "seize" Plaintiff within the meaning of the Fourth Amendment; TPD officers arrested Plaintiff, and Defendants "had no part in the arrest, handcuffing of Plaintiff, or his transport to the PCADC." (*Id.* at 12.) The Court accepts the Defendants' argument that the Plaintiff "was obviously a pretrial detainee when he interacted with [Defendants]," but rejects the assertion that, therefore, the Fourteenth Amendment, not the Fourth Amendment standard, applies to Plaintiff's excessive use of force claim. (*Id.* at 13.)

The Fourth Amendment governs § 1983 claims based on excessive use of force during the "arrest, investigatory stop, or other 'seizure' of a free citizen." *Graham v. Connor*, 490 U.S. 386, 395 (1989) (emphasis added). Post-arraignment, detainees are

entitled to the protections of the Substantive Due Process Clause in the Fourteenth Amendment. *Id.* at 395 n.10 (1989) (citing *Bell v. Wolfish*, 441 U.S. 520, 535–39 (1979)). "After conviction, the Eighth Amendment serves as the primary source of substantive protection in cases where the deliberate use of force is challenged as excessive and unjustified." *Id.* (internal quotation marks and ellipses omitted). Since the Eighth Amendment standard permits punishment if it's not cruel and unusual while the Fourteenth Amendment standard prohibits all punishment, the latter is "more protective." *Bell*, 441 U.S. at 535 n.16 (1979); *Gary H. v. Hegstrom*, 831 F.2d 1430, 1432 (9th Cir. 1987). The Fourth Amendment provides even greater protection from unreasonable uses of force.

"The custodial continuum runs through the initial arrest or seizure, post arrest but pre-charge or pre-hearing custody, pretrial detention, and post-conviction incarceration." *Pierce v. Multnomah County*, 76 F.3d 1032, 1043 (9th Cir. 1996). Therefore, the constitutional basis for a detainee's claim differs depending on his status at the time of the alleged violation.

In *Pierce*, interpreting *Graham*, the Ninth Circuit agreed with other precedent that "applies the Fourth Amendment standard to assess the constitutionality of the duration of or legal justification for a prolonged warrantless, post-arrest, pre-arraignment custody." *Pierce*, 76 F.3d at 1043 (emphasis added). The court held that the "Fourth Amendment sets the applicable constitutional limitations on the treatment of an arrestee detained without a warrant up until the time such arrestee is released or found to be legally in custody based upon probable cause for arrest." *Id.* at 1043.

In *Gibson v. County of Washoe*, the widow of a decedent brought a § 1983 claim against the County, the sheriff, and several deputies, on duty at the jail when her husband died from a heart attack while in custody on the night of his arrest. The Ninth Circuit looked to *Graham* and *Pierce,* finding *Graham* "explicates the standards applicable to a pretrial detention excessive force claim in this circuit," and that "the Fourth Amendment sets the 'applicable constitutional limitations' for considering claims of excessive force during pretrial detention." *Gibson v. County of Washoe*, 290 F.3d 1175, 1197 (9th Cir. 2002)

(quoting *Pierce*, 76 F.3d at 1043); *see also Lolli v. Cty. of Orange*, 351 F.3d 410, 418-19 (9th Cir. 2003) (holding that "the Fourth Amendment provides the proper framework for Lolli's excessive force claim ....").

Here, the Plaintiff's detention status was post-arrest and pre-arraignment, therefore, the constitutional basis for his claim is the Fourth Amendment, which protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Const. Amend. IV.

### B.     Excessive Force

#### 1.     Legal Standard

A Fourth Amendment claim that law enforcement officers used excessive force during an arrest is analyzed under the objective reasonableness standard. *Graham*, 490 U.S. at 395. The reasonableness inquiry requires a "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interest against the countervailing governmental interests." *Id.*

To determine whether a Fourth Amendment violation has occurred, the court conducts a three-step analysis, assessing (1) the type and amount of force inflicted; (2) the governmental interests at stake, which involves assessing a non-exhaustive list of factors including the severity of the crime, the threat posed by the suspect, and whether the suspect was resisting arrest (the "*Graham* factors"); and (3) whether the force used was necessary. *See Thompson v. Raheem*, 885 F.3d 582, 586 (9th Cir. 2018); *Espinosa v. City & Cnty. of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010) (citing *Graham*, 490 U.S. at 396−97, and *Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003)). "Ultimately, [courts] must balance the force that was used by the officers against the need for such force to determine whether the force used was "greater than is reasonable under the circumstances." *Espinosa*, 598 F.3d at 537.

"The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 20−22 (1968)). This is because

[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396−97.

At the summary judgment stage, once the Court has "determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record," the question whether an officer's actions were objectively reasonable under the Fourth Amendment is a "pure question of law." *Scott*, 550 U.S. at 381 n.8. But an officer is not entitled to summary judgment if the evidence, viewed in the nonmovant's favor, could support a finding of excessive force. *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005). Because the excessive force balancing test is "inherently fact specific, the determination whether the force used to effect an arrest was reasonable under the Fourth Amendment should only be taken from the jury in rare cases." *Green v. City and Cnty. of San Francisco*, 751 F.3d 1039, 1049 (9th Cir. 2014) (internal quotation marks omitted); *see Smith*, 394 F.3d at 701 (excessive force cases often turn on credibility determinations, and the excessive force inquiry "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom") (quotation omitted).

### 2. Analysis

The Court must consider the "specific factual circumstances" of the case in classifying the force used. *Lowry v. City of San Diego*, 858 F.3d 1248, 1256 (9th Cir. 2017). "The nature and degree of physical contact are relevant to this analysis, as are the risk of harm and the actual harm experienced." *Williamson v. City of National City*, 23 F.4th 1146, 1152 (9th Cir. 2022) (internal citations omitted).

Defendants argue they "did not use force" but rather "were faced with a situation of an uncooperative pretrial detainee, whose conduct would not allow a pat search necessary for the safety of the other inmates, officers, and staff." (Doc. 29 at 10.) Defendants contend they were "simply following policy in placing Plaintiff into the restraint chair," and because Plaintiff refused to cooperate, Defendants "had no choice other than to lift Plaintiff

up off the ground and place [him] into [the] restraint chair." (*Id.* at 10-11.) Thus, Defendants assert, their physical contact with Plaintiff was "warranted," and the degree of physical contact was "minimal." (*Id.* at 10.) Defendants also contend Plaintiff suffered only de minimis injury. (*Id.* at 11.)

Defendants assert the government interest supporting the use of the restraint chair was to enable booking the Plaintiff into detention at PCADC, including doing a pat search. The video recording undisputedly establishes that Plaintiff did not move of his own volition after he fell at the courthouse during the arrest. He never moved again of his own accord. Police officers had to lift him into the police car to transport him to PCADC. The closest Plaintiff came to moving on his own was when he agreed to get out of the police car but in the end, Defendants lifted him out of the police car at PCADC and lifted him into the restraint chair to move him from the sally-port into the detention center. There is not one instance on the video referenced by the Plaintiff or observed by the Court where or when the Plaintiff even attempts to move of his own volition. The Plaintiff's assertion that he did not refuse to stand or walk, therefore, must be an assertion that he could not do so, not that he would not do so. There is no evidence proffered by Plaintiff, however, to support an assertion of physical incapacity. The video evidence of Plaintiff's responses, physical and verbal, to the sternum rubs by EMT's after his fall at the courthouse suggest otherwise. The Court concludes that the record does not support any physical incapacity to sit, stand, walk, or bend forward while sitting. There was a governmental interest to use force to move Plaintiff, who was refusing to cooperate and get out of the police car, stand and walk, and then to secure him in the restraint chair in order to book him into detention at PCADC.

Defendants deny any excessive use of force and argue that the risk of harm to Plaintiff by pulling him by his arms, lifting him by his legs and upper torso, and placing him and securing him in the restraint chair was minimal. With respect to the actual harm Plaintiff experienced, Defendants contend he did not suffer any injury attributable to them, but even if he did, the injury was de minimis. (*Id.* at 11.) Defendants note that when Plaintiff was removed from the restraint chair, he admitted to Nurse Song that he did not

have any injuries, was not feeling pain, and did not need medical treatment. (*Id.*) Defendants point out that Plaintiff testified during his deposition that he did not know if he suffered any injury during the incident. (*Id.*) Defendants also note that Plaintiff admitted that his shoulder was injured when TPD officers arrested him and that he "only told his doctor about TPD's conduct as a cause of the injury to his shoulder." (*Id.* at 12.)

Assuming it is true that the Plaintiff became unconscious while being bent forward in the restraint chair, Plaintiff presents no evidence that he suffered more than minimal harm due to Defendants' alleged conduct.

Under *Graham*, whether the initial use of force was reasonable depends on the governmental interests at stake at the time, which requires analyzing such things as the severity of Plaintiff's suspected crimes, the threat Plaintiff posed to himself or others, and whether Plaintiff was resisting arrest. *Espinosa*, 598 F.3d at 537; *Graham*, 490 U.S. at 396−97. These factors are not exclusive. Rather, the Court must "examine the totality of the circumstances and consider whatever specific factors may be appropriate in a particular case." *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (internal quotation marks and citations omitted).

Plaintiff had been arrested for the charge of disorderly conduct and contributing to the delinquency of a minor, both misdemeanors. There is no question these were not severe crimes. It is undisputed that Plaintiff was already handcuffed when he arrived at the PCADC secure parking lot. He was, therefore, "restrained" and posed little or no threat to officers. Plaintiff, conclusorily, disputes Defendants' assertion that he was resisting and/or not cooperating, but he fails to reference, and the Court has found none, any instance in the video evidence he presents to reflect even an attempt by him to sit, stand or walk on his own. The record reviewed in the light most favorable to Plaintiff, reflects that when assisted by Defendants to stand or walk, he instead collapsed attesting he could not do it. The parties are arguing semantics; Plaintiff did not stand or walk at any time during the time of the incident in the sally-port. The Court finds that the evidence viewed in a light most favorable to Plaintiff supports the conclusion that force was needed to remove the Plaintiff from the

police car and move him from the sally port into the detention center because Plaintiff was not complying with directives to get out of the police car, stand, and walk.

The Ninth Circuit has emphasized that "it is the need for force which is at the heart of the consideration of the *Graham* factors." *Alexander v. City & Cnty. of S.F.*, 29 F.3d 1355, 1367 (9th Cir. 1994), *abrogated on other grounds by County of Los Angeles v. Mendez*, 137 S. Ct. 1539 (2017). In considering the need for force, the Court must balance the force used against the need for such force to determine whether the force used was "greater than reasonable under the circumstances." *Espinosa*, 598 F.3d at 537 (quoting *Santos*, 287 F.3d at 854). As noted above, whether the force used was reasonable is judged from the perspective of a reasonable officer on the scene. *Graham*, 490 U.S. at 396–97.

It is undisputed that the Defendants knew that the Plaintiff had fallen and bumped his head during his arrest and been checked out and found to be ok by EMTs. Defendants knew that Plaintiff had not cooperated with TPD officers during the arrest, and officers had to lift and carry the Plaintiff, including lifting him into the police vehicle for transport from City Court to PCADC. In other words, Defendants knew that the lack of cooperation had extended for over an hour, already. Defendants needed to remove Plaintiff from the police car and move him from the sally-port to booking. Judging the reasonableness of the particular uses of force from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight, the Court finds it was not excessive force to lift Plaintiff and use the restraint chair to subdue him from stonewalling the booking process, including the requisite security pat search.

The Court must address the Plaintiff's assertion that Defendants' used excessive force because they choked him until he lost consciousness. *See Jones v. Las Vegas Metro. Police Dep't*, 873 F.3d 1123, 1130 (9th Cir. 2017) (concluding that officers were at first justified in using a Taser on a suspect who had run away from a traffic stop but neither threatened the officers nor committed a serious offense, but they were not justified in continuing to tase him after he was restrained); *Drummond*, 343 F.3d at 1056 ("The officers—indeed, any reasonable person—should have known that squeezing the breath

from a compliant, prone, and handcuffed individual despite his pleas for air involves a degree of force that is greater than reasonable.") Choking is a quantum of force that is only reasonable when it is necessary to prevent escape, and officers have probable cause to believe that the arrestee "poses a significant threat of death or serious physical injury to the officer or others." *Smith v. City of Hemet*, 394 F.3d 689, 704 (9th Cir. 2005) (internal quotation marks and citation omitted).

The video recordings reflect that the alleged choking occurred while Defendants were securing the Plaintiff in the restraint chair. Because his hands were cuffed behind his back, the handcuffs had to be removed to secure him in the chair with his arms and wrists positioned forward with him sitting back in the chair. The video reflects a struggle, including Plaintiff arching his back, wriggling and slipping down in the chair. He had to be lifted back into the restraint chair or he would have succeeded in coming out of it. It took four officers to physically get control of the Plaintiff, including bending him forward while trying to secure his legs, remove the handcuffs, and secure his arms and wrists in front. *Supra.* at 9-10 (citing (Williams body-camera recording, Ex. 1 (Doc. 41) at 43:58 to 46:16, 43:58 to 46:16).

The Court recognizes that there are blank spots and silent stretches in the videos, but the videos when viewed together allow a comprehensive picture of what transpired on the sally-port at PADC. Nevertheless, the Court does not accept the Plaintiff's self-serving conclusory attestation that Defendants were pretending to struggle with the Plaintiff. The video reflects a degree of force was used as was needed to position Plaintiff in the restraint chair over Plaintiff's resistance to securing his legs, removing the handcuffs and repositioning and securing his arms and wrists in front on the chair, fitting him with a spit mask and securing his head to the chair. The video evidence reveals that Plaintiff was conscious after having been bent forward because he continued to pull against Defendants as they attempted to secure his uncuffed arms and wrists to the front of the chair. *Supra*. at 10. If there was a period of unconsciousness it was not the result of excessive force when Defendants bent the Plaintiff forward, which was necessary to secure his legs, remove the

handcuffs, and position his arms and wrists in front to secure the Plaintiff in the restraint chair.

On summary judgment, the Court may not make credibility determinations or weigh conflicting evidence. *Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir.1990). The standard for granting summary judgment is the same standard used to direct a verdict: does the evidence present a sufficient disagreement to require submission to a jury or is it so one-sided that one party must prevail as a matter of law. *Id.* (citation omitted). Both standards are rare exceptions to the presentation of factual determinations to a jury. This is one of those rare cases. The Court finds that on the record, a reasonable jury could not conclude that the force used was greater than reasonable under the circumstances.

### C.    Qualified Immunity

#### 1.    Legal Standards

Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In deciding if qualified immunity applies, the Court must determine: (1) whether the facts alleged show the defendant's conduct violated a constitutional right; and (2) whether that right was clearly established at the time of the violation. *Pearson v. Callahan*, 555 U.S. 223, 230-32, 235-36 (2009) (courts may address either prong first depending on the circumstances in the particular case).

Here, because the Court finds that Defendants' conduct did not violate the Constitution, Defendants are entitled to qualified immunity. The Court finds that Defendants are likewise entitled to qualified immunity because the right to be free from the use of some force, when a detainee will not stand and walk of his own accord, was not clearly established in circumstances similar to those faced by Defendants.

The plaintiff has the burden to show that the right was clearly established at the time of the alleged violation. *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002); *Romero v. Kitsap County*, 931 F.2d 624, 627 (9th Cir. 1991). Whether a right was clearly established

must be determined "in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). In addition, the right must be "sufficiently definite that any reasonable official in the defendant's shoes would have understood he was violating it." *Nicholson v. City of Los Angeles*, 935 F.3d 685, 695 (9th Cir. 2019) (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018)). Thus, "the contours of the right must be sufficiently clear that at the time the allegedly unlawful act is [under]taken, a reasonable official would understand that what he is doing violates that right;" and "in the light of pre-existing law the unlawfulness must be apparent." *Mendoza v. Block*, 27 F.3d 1357, 1361 (9th Cir. 1994) (quotations omitted). Therefore, regardless of whether the constitutional violation occurred, the officer should prevail if the right asserted by the plaintiff was not "clearly established" or the officer could have reasonably believed that his particular conduct was lawful. *Romero*, 931 F.2d at 627.

The Court must begin by inquiring whether the constitutional violation was clearly established by "defining the law at issue in a concrete, particularized manner." *Shafer v. County of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017). Plaintiff must demonstrate that, at the time of the alleged violation, the state of the law gave fair warning that the relevant conduct was unconstitutional. *See Ballentine v. Tucker*, 28 F.4th 54, 64 (9th Cir. 2022). "Courts should look to precedent for evidence that the unlawfulness of an officer's conduct is clearly established" regardless of whether the officer is alleged to have made a mistake of fact or a mistake of law. *J. K. J. v. City of San Diego*, 42 F.4th 990, 1001 n.4 (9th Cir. 2021). If the right is clearly established by decisional authority of the Supreme Court or the Ninth Circuit, this Court's inquiry "should come to an end." *Boyd v. Benton County*, 374 F.3d 773, 781 (9th Cir. 2004).

## 2. Analysis

In their Motion, Defendants contend that if an officer shows the action was within their discretionary authority, then the plaintiff must allege facts establishing that a constitutional right was violated and that the right was clearly established at the time. (Doc. 29 at 8.) Defendants assert that "[t]here is no doubt that the Officers, in placing Plaintiff

into the restraint chair, were acting within their discretionary authority," and therefore, Plaintiff must meet his burden of proof to show his right was clearly established at the time. (*Id.*) Defendants argue that Plaintiff cannot meet his burden because "[t]here is no law that use of a restraint chair for uncooperative pretrial detainees is unconstitutional." (*Id.*)

The Court finds that a reasonable officer in Defendants' position would have believed the Plaintiff was an uncooperative pretrial detainee. Plaintiff made no attempt to move of his own volition to exit the police car, to stand, or to walk. Defendants knew he had been checked by EMT's after falling and bumping his head and found to be ok. Defendants knew he had been uncooperative by refusing to stand and walk during his arrest. The Court finds that based on the evidence in the record, the Defendants reasonably believed the Plaintiff was capable of standing and walking, and therefore, that he was not cooperating and was instead resisting their directives. Any reasonable officer would have believed it was necessary to get the Plaintiff booked into PCADC, including getting the Plaintiff out of the patrol car, pat searching him, and getting him from the secured parking lot and into the facility. The Court finds that a reasonable officer in Defendants' position could have believed the use of some force was necessary in response to Plaintiff's uncooperativeness and resistance.

This is not a case like *Nelson v. City of Davis*, 685 F.3d 867, 881 (9th Cir. 2012), which clearly established that "a failure to fully or immediately comply with an officer's orders neither rises to the level of active resistance nor justifies the application of a non-trivial amount of force." Plaintiff failed to comply with officers' orders over an extended period of time-- close to two hours. When he refused to get out of the police car, Defendants had little choice but to lift him out. When he would not stand and walk, Defendants reasonably used the restraint chair to move him inside from the sally port because it addressed his lack of cooperation and lack of ambulation. Assuming use of a restraint chair, including the spit mask, involves a non-trivial amount of force, the quantum of force involved in using it correlates directly to the degree of resistance encountered to its use. Here, the Plaintiff resisted being placed in the restraint chair, including Defendants' efforts

to remove the handcuffs, sit him back in the chair and move his arms and hands forward to be secured in the restraint chair. If restraining him caused him to lose consciousness it was short lived and due to his resistance to being secured in the restraint chair; Plaintiff controlled the degree of force by his degree of resistance.

*Williamson v. City of National City*, 24 F.4th 1146 (9th Cir. 2022), the case citied by the Plaintiff, does not help him. Plaintiff relies on it to show that he was treated much more harshly. In *Williamson*, the plaintiff participated in a "die-in" protest against police brutality at a city council meeting, where the group disrupted the meeting by showing their red-painted hands and chanting you have blood on your hands, then laying down on the ground near the podium and refusing to move. After warning the protestors they would be arrested, police handcuffed her and lifted her toward a standing position, but when she refused to stand, they lost grip on her, dropping her to the ground on her stomach. They repositioned her onto her back and again tried lifting her, with one officer lifting her left arm and the other her right arm. As they lifted her, she refused to support her own weight and in the struggle to lift her, she was pulled backward by her arms and wrists while she was in nearly a seated position for approximately 12 seconds and then pulled and dragged from the room by her left wrist and forearm resulting in a sprained wrist, mild swelling, and a torn rotator cuff.

The court in *Williamson,* found no constitutional violation even though the government interest in removing the protestors may have been low, it was not nonexistant. Even passive resistance may support the use of some degree of force if necessary to attain compliance, depending on the factual circumstances underlying the resistance. Here, the court found the officers use of force was appropriately minimal; they did not throw her to the ground, use any compliance techniques or weapons for the purpose of inflicting pain. Rather, police chose a degree of force necessary to remove her from the room. "If a person reacts more adversely to a use of force than would be expected objectively, that does not itself establish that 'a reasonable officer on the scene' failed to appreciate the risks presented and act accordingly." *Id*. at 1153 (citing *Rice v. Morehouse,* 989 F.3d 1112, 1121

(2021). In balancing the interests, the court found the use of force, appropriately minimal because police used only force reasonably necessary to remove the protestors from the meeting and force could have been avoided by plaintiff if she had left the room under her own power. "She did not," but her choice [did] not render the police conduct unreasonably excessive, i.e., not minimal. "To conclude otherwise would be to discount entirely the City's legitimate interests in maintaining order and ensuring the public's business is not circumvented by people engaging in disruptive, albeit nonviolent, conduct." *Id.* at 1154-55.

In this case, the Court finds that Defendants' conduct of using the restraint chair, including bending Plaintiff forward to secure his legs and remove his handcuffs, even if it caused unconsciousness, did not violate a clearly established constitutional right of which a reasonable person would have known. Defendants used a degree of force that could have been avoided by the Plaintiff if he had gotten out of the police vehicle, stood up and walked. Plaintiff's alleged unconsciousness would not have been an expected consequence of using a restraint chair, including bending him forward for the short time it took for Defendants to remove his handcuffs and secure him in the restraint chair.

The Court adds that even if Plaintiff could prevail on his constitutional claim, this is precisely the type of governmental conduct protected by the doctrine of qualified immunity. *Pearson*, 555 U.S. at 231; *Harlow v. Fitzgerald*, 457 U.S. at 800. Qualified immunity "shields an officer from suit when [he or] she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances confronted. Even if the officer's decision is constitutionally deficient, qualified immunity shields [him or] her from suit if [his or] her misapprehension about the law applicable to the circumstances was reasonable." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). The purpose of the doctrine is "to recognize that holding officials liable for reasonable mistakes might unnecessarily paralyze their ability to make difficult decisions in challenging situations, thus disrupting the effective performance of their public duties." *Mueller v. Auker*, 576 F.3d 979, 993 (9th Cir. 2009). Because it is inevitable that law enforcement

- 24 -

officials will in some cases reasonably but mistakenly conclude that conduct is constitutional, qualified immunity protects officials "who act in ways they reasonably believe to be lawful." *Garcia v. Cty. of Merced*, 639 F.3d 1206, 1208 (9th Cir. 2011). It "gives ample room for mistaken judgments" and protects "all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224 (1991); *see also Ashcroft v. al–Kidd*, 131 S. Ct. 2074, 2085 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

The Court finds that qualified immunity bars this suit. Even if Plaintiff could prevail on his constitutional claim of excessive use of force, which he cannot, the Defendants' use of the restraint chair, including bending the Plaintiff over to secure his legs and remove his handcuffs was a reasonable mistake, even if it caused the Plaintiff to lose consciousness.

**Accordingly,**

**IT IS ORDERED** that the Defendants' Motion for Summary Judgment (Doc. 29) is GRANTED.

**IT IS FURTHER ORDERED** that the Clerk of the Court shall enter Judgment accordingly.

Dated this 28th day of March, 2023.

Honorable David C. Bury
United States District Judge